**Opinion issued October 30, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

### NO. 01-18-00457-CV

———————————

## IN THE INTEREST OF A.F.S. AND E.L.S., Children

———————————————————————

### On Appeal from the 300th District Court
### Brazoria County, Texas
### Trial Court Case No. 87712-F

———————————————————————

## MEMORANDUM OPINION

This is an appeal from a decree terminating a mother's parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her children. The mother contends that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in her children's best interest. She also contends that the trial

court abused its discretion by appointing the Department as sole managing conservator. Because the evidence is sufficient to support the trial court's decree and because the mother consequently lacks standing to challenge the trial court's conservatorship decision, we affirm.

## Background

Sean Speers and Jessica Perez's two female children, A.F.S. and E.L.S., are the subjects of this parental-termination proceeding. The Department of Family and Protective Services received allegations of neglectful supervision and methamphetamine use by the mother. A Department caseworker began an investigation and discovered that the children were staying with their paternal grandfather and his wife, Maynard and Stephani Speers. After concluding the children were safe with them, the caseworker left. The caseworker later met with the girls' father, who expressed his concern that the mother was using methamphetamine.

The caseworker later followed up with the Speers and learned that they returned the children to the mother. The caseworker was concerned and discovered that the mother left the girls with her friend Arleene Quiroz. The caseworker then met the girls and the mother at a nearby police station.

At the police station, the mother stated that she was not using illegal drugs. The mother took a drug test and tested positive for methamphetamine. The caseworker told the mother that she could not leave with the girls because she tested positive. The caseworker then tried to find a friend or family member of the mother who could take the children. The caseworker called the Speers, the father's mother, a family friend, and Quiroz, but all were unable to take the children. The Department then placed the children in foster care.

Later that month, the Department filed a petition in the Brazoria County district court seeking temporary managing conservatorship of the girls and termination of the mother's parental rights if reunification with her was found to be unsuitable. The trial court held an emergency hearing the same day and appointed the Department as temporary managing conservator pending a full adversary hearing.

The Department developed a family service plan for the mother. The trial court ordered the mother to comply with the plan, which listed several tasks and services the mother needed to complete before she could be reunified with her daughters. The plan stated that it was intended to help the mother provide a safe environment for the girls within a specified time and that, if she was unwilling or unable to provide that safe environment, parental and custodial duties and rights could be restricted or terminated and the children may not be returned. About a

3

year after the mother was given her family services plan, the Department submitted a permanency report to the trial court that detailed both parents' inadequate progress towards completing the required services. The girls' father relinquished his parental rights after the Department submitted its permanency report.

The Department's petition to terminate the mother's parental rights was tried to the bench. At the trial, the Department called a number of witnesses, including the caseworker who initially investigated the case as well as two other caseworkers, the children's psychotherapist, the mother, and the children's foster mother. The mother called no witnesses.

The initial caseworker described the reasons for his involvement with the case and for the Department's decision to file its original petition. Another caseworker testified that although the mother completed a drug assessment, some parenting classes, and a psychological evaluation, she failed to satisfy other aspects of her service plan. The mother failed to appear for thirty-one scheduled drug tests, follow the recommendation of her psychological evaluation by initiating intensive-outpatient therapy, show up for individual therapy, provide any proof that she was attending her narcotics-anonymous meetings, and follow any of the recommendations made by the girls' therapist. The caseworker also stated that after the girls were placed in foster care, the mother would occasionally miss visits with her children and, when she did appear, she was often late. The caseworker did

acknowledge on cross-examination, however, that the mother told her that it was difficult to find transportation to and from therapy, other services required by the family services plan, and visits with the children.

The mother then took the stand. On direct-examination, she testified that she was trying to find a job during the week that she left her girls with Quiroz. She claimed that she attended narcotics-anonymous meetings three times a week. The mother also stated that she works for an apartment complex and has a permanent residence in Crosby, where she pays $600 in monthly rent. When asked by the court why she did not take the court-ordered drug tests, she responded, "I don't know. Those times I had somebody bring me up here. They didn't want to wait around, I guess. Other times because of work." Trial concluded for the day before the mother's examination was finished. The parties planned to finish her examination the following day, but she failed to appear.

The Department then called the girls' foster mother. The foster mother testified that she had both girls evaluated and discovered that they were academically behind. She also explained that E.L.S. told her that once her mother left her with someone who sexually abused her. She stated that both girls told her that they want to be with their "mommy and daddy," but would just as often ask "if their mommy and daddy can come live" with them so she "can take care of them, too." The foster mother also reported that while the girls said they fear not having a

safe bed and everything they need for school if they go home with their parents, "in the very next breath they will express how they want to go home."

The Department called as its last witness a third caseworker who corroborated the previous caseworker's statement regarding the mother's failure to provide any proof that she attended narcotics-anonymous meetings. She also stated that every time she asked the mother why she does not take the drug tests, she would say she did not have a ride. After the mother's counsel finished cross examining the caseworker, both parties rested.

The trial court terminated the mother's parental rights, finding that she engaged in conduct that endangered the girls' physical or emotional well-being, that she knowingly placed the girls in conditions that endangered their physical or emotional well-being, and that termination was in the girls' best interests. The trial court appointed the Department as permanent managing conservator and continued the girls' placement with their foster mother. Finally, the judge noted that he believed the Department's reasons for denying a home study of the maternal grandmother as a potential placement for the children were "weak, at best." The judge did not expressly foreclose the possibility that the girls could be later placed with the grandmother, but he did state that he could not currently place the girls with the grandmother, who was not present in the court, without being able to ask her questions.

The mother appeals.

## Analysis

On appeal, the mother challenges the legal and factual sufficiency of the evidence supporting termination of her parental rights. She also contends that the trial court abused its discretion by appointing the Department as managing conservator of the children.

### I.      Sufficiency of the evidence to support best-interest finding

Before a trial court may terminate parental rights, the Department must prove by clear and convincing evidence that both a predicate statutory ground under section 161.001(b)(1) exists and that termination of parental rights is in the children's best interests. TEX. FAM. CODE § 161.001(b); *In re B.L.D.*, 113 S.W.3d 340, 353–54 (Tex. 2003). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. The mother does not challenge the trial court's predicate statutory findings. Instead she challenges only the trial court's finding that termination of her parental rights was in A.F.S.'s and E.L.S.'s best interests, arguing that the evidence underlying the finding is both legally and factually insufficient.

To assess the evidence's legal sufficiency, we consider all evidence in the light most favorable to the trial court's finding and decide "whether a reasonable

trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that any disputed facts were resolved in favor of the finding as long as a reasonable factfinder could have done so. *Id.* If "no reasonable factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, then we "must conclude that the evidence is legally insufficient." *Id.* In reviewing the factual sufficiency of the evidence, we consider the entire record, including disputed evidence. *Id.* (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

To assist us in our analysis of the legal and factual sufficiency of the evidence underlying the trial court's finding that termination was in the children's best interests, we evaluate the entire record in light of the factors set out in *Holley v. Adams*: (1) the children's desires; (2) the children's current and future physical needs; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the children's best interests; (6) the plans for the children by these individuals or by the agency seeking custody;

8

(7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). The list of *Holley* factors is not exhaustive, and evidence of all nine factors is not required to support a termination judgment. *Id.* at 372. Evidence that establishes the predicate acts under section 161.001(b)(1) may be relevant to determining the best interest of the child. *C.H.*, 89 S.W.3d at 27–28.

The mother admitted that she used to have a methamphetamine addiction, and throughout the course of this suit, caseworkers and the trial court asked her at least thirty-one times to take a drug test, but she took none of those tests. The trial court reasonably could have concluded that the mother was refusing to take drug tests because she was still using illegal drugs during the suit. *See In re D.J.W.*, 394 S.W.3d 210, 221 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). This evidence could have been weighed in favor of termination under the third and eighth *Holley* factors focusing on physical danger to the child and any actions indicating an improper parent-child relationship.

The factfinder could have found that the eighth *Holley* factor, considering the parent's acts and omissions that indicate an improper parent-child relationship, further weighs in favor of terminating the mother's parental rights. Despite the affirmative efforts of caseworkers to help the mother meet the requirements of the

9

family services plan, she repeatedly demonstrated her unwillingness to take the necessary steps to ensure that she promotes the best interests of her children. For example, one caseworker sat down with her, printed the family services plan, and explained the entire plan to her. That same caseworker kept in monthly contact with the mother to keep her on track. Nonetheless, the mother failed to sign up for outpatient drug therapy, failed to provide proof that she was attending narcotics-anonymous meetings, and failed to follow the recommendations of the children's psychologist. These failures, in conjunction with the thirty-one untaken drug tests, supports a conclusion that the mother was unwilling to complete available programs and services that were designed to ensure that parents act in a manner that promotes the best interests of their children. The mother's unexplained failure to appear in court to finish her testimony also could have supported an inference that the mother's commitment to take care of her children was inadequate.

There was also evidence that the mother failed to meet the children's emotional needs. For example, the children's psychologist concluded that A.F.S. felt the need to parent her mother, stating, "she felt it was her responsibility to make sure certain things were done as far as like make sure they ate or they got up, got dressed for school," things usually "attributed to the parent." The psychologist noted that A.F.S. "felt she was responsible for" the mother and her sister. Further, before scheduled visits with the mother, the children would become anxious

10

because they were unsure if she would show up. The mother often would show up late to her scheduled visits with the children, and occasionally she would not show up at all. A factfinder could have determined that this evidence weighs in favor of termination under the second and fourth *Holley* factors focusing on the children's emotional needs and the parent's ability to meet those needs.

The evidence also supported a conclusion that the mother experienced difficulties in providing the children with a safe environment, disfavoring her under the third and seventh *Holley* factors, which consider the stability of the home and the emotional and physical danger to the children. When this case began, the mother was homeless. She would often leave the children with friends and family for days and even weeks without providing a change of clothes or other necessities.

In contrast, the evidence presented about the foster mother supported a conclusion that they provided a stable and nurturing environment to the children. Testimony established that when A.F.S. first arrived at the foster mother's home, she was academically behind in reading and math. The foster mother had her evaluated and sat down with A.F.S. and helped her do her homework every night. At the time of trial, A.F.S. was a straight-A student and in the top reading level in her class. When E.L.S. first arrived at the foster home, she could not count to ten or recite the alphabet. By trial, she was reading in pre-K receiving excellent marks. Also, when E.L.S. arrived she had trouble balancing and moving properly, so the

foster mother enrolled her in a dance class and engaged in constructive play on a weekly basis. She now has no trouble balancing and moving around. Further, the foster mother set up weekly in-house therapeutic visits for the children. And since then, both children have seen improvements in their mood and confidence.

The trial court also could have viewed the ninth *Holley* factor, which considers any excuse for the acts or omissions of the parent, as favoring termination. The mother often blamed her failure to complete services or take drug tests on her inability to find reliable transportation. The trial court reasonably could have concluded that this excuse may have justified her missing a few drug tests and few days of progress towards completing the services, but not her failure to take even one drug test nor her failure to complete a number of required services.

Considering all the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of the mother's parental rights would be in the children's best interests. The Department presented evidence that the mother's conduct placed the children in physical and emotional danger, undermined her own ability to complete the services required by the family services plan, and indicated an improper parent-child relationship. The only *Holley* factor that weighs against termination was the children's desire to live with the mother, but no one factor is determinative. *See Holley*, 544 S.W.2d at 372. The trial court reasonably could

12

have concluded that this factor was greatly outweighed by the others and the evidence demonstrating that the foster mother was satisfying the children's needs and providing stability. Furthermore, there was no disputed evidence that a reasonable factfinder could not have resolved in favor of finding that termination was in the children's best interests, so as to prevent the trial court from forming a firm belief or conviction in that regard. Accordingly, we overrule the mother's challenge to the legal and factual sufficiency of the evidence to support termination.

## II.   Appointment of the Department as permanent managing conservator

The mother argues that the trial court abused its discretion by appointing the Department as the girls' permanent managing conservator. She contends that the trial court should have appointed her mother, the children's maternal grandmother, as the permanent managing conservator.

Because we have overruled the mother's challenge to the portion of the trial court's order terminating her parental rights, she now lacks standing to challenge the trial court's conservatorship decision. An order that terminates a parent-child relationship divests that parent of all legal rights and duties respecting that child. *See* TEX. FAM. CODE. § 161.206(b). And an appealing party cannot complain of errors that do not harm her or that affect only the rights of others. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (Tex. 2000). Accordingly, we hold that the mother

now lacks standing to challenge the trial court's conservatorship decision. *See, e.g.,* *In re D.K.W.*, No. 01-17-00622-CV, 2017 WL 6520439, at \*5 (Tex. App.— Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). We therefore overrule the mother's second issue.

## Conclusion

We affirm the trial court's judgment.

Michael Massengale
Justice

Panel consists of Justices Jennings, Higley, and Massengale.